90 P.3d 306

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Everett A. FEES, Defendant–Respondent.**

**No. 29421.**

Supreme Court of Idaho,
Boise, April 2004 Term.

April 22, 2004.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellant. Kenneth K. Jorgensen argued.

Frederick G. Loats, Coeur d'Alene, for respondent. Frederick G. Loats argued.

EISMANN, Justice.

The district court held that a telephonic search warrant was invalid because the magistrate judge did not sign an original of the warrant when he authorized a peace officer to affix the magistrate's signature to a duplicate original of the warrant. The district court also held that a warrantless entry into a residence to preserve evidence of the felony crime of trafficking in marijuana was invalid because it was done before the search warrant hearing and to preserve evidence of a nonviolent crime. The State appealed, and we hold that the district court erred in granting the motion to suppress on those grounds. We therefore vacate the order and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

A state and federal law enforcement investigation led authorities to suspect that defendant-respondent Everett A. Fees was distributing a substantial amount of marijuana from his residence in Hayden, Idaho. Much of the information came from an informant in Montana who told police that he had been purchasing marijuana from Fees once or twice a month for two years and that he usually purchased five pounds at a time. He stated that he usually met Fees at his house or restaurant and that Fees said he stored the marijuana in his basement. The Informant agreed to make a controlled buy of marijuana from Fees.

On Wednesday, February 13, 2002, the Informant telephoned Fees to arrange to

purchase five pounds of marijuana. Fees stated that he would travel to Eugene, Oregon, to obtain the marijuana from his supplier and that the Informant must pay in advance. They arranged to meet the same day at the Wal Mart store in Sandpoint, Idaho. Prior to that meeting, the police gave the Informant $6,500 in $20 bills, which the police had photocopied to record their serial numbers. Idaho State Police Detective Terry Morgan then used binoculars to observe the Informant's meeting with Fees and recorded the meeting with a video camera and an audio transmitter that was attached to the Informant. During the meeting, the Informant gave Fees the $6,500, and Fees said that he would fly to Portland, Oregon, that day and be back by Saturday.

Police kept Fees under surveillance as he traveled from the meeting with the Informant to the airport in Spokane, Washington. While en route, Fees exchanged the $20 bills for $100 bills. The police confirmed that the serial numbers of the bills Fees exchanged matched the serial numbers of the bills given to the Informant. Fees then boarded a flight to Portland, carrying his briefcase.

In Portland, a federal narcotics agent followed Fees. He observed Fees rent a car and drive to a house in Eugene, where a woman gave Fees a two-foot by two-foot box wrapped in red paper. Fees placed the box in the trunk of the car and then drove to a local bar, where he picked up two men. He then drove to a motel, where he and the two men checked into a room, taking the red box with them. After about thirty minutes, they left the room with the box, but it had been unwrapped. Federal agents later searched the motel room, and they discovered red wrapping paper in the trash can, cellophane wrap that smelled like marijuana, and some stems from marijuana plants. Fees drove back to the house in Eugene, where he talked with the woman for about five minutes, and then drove to a motel where he spent the night. Early the next morning, Fees went to the airport and flew back to Spokane. His wife picked him up at the airport and drove to their house in Hayden, where they entered the house with Fees carrying his briefcase.

The next day on Friday, Detective Morgan observed Fees load a half-full, black, apparently heavy garbage bag into a car registered to his brother-in-law and then deliver that bag to a house in Spokane. He later drove to the Spokane airport and purchased a round-trip ticket to Portland that left that day and returned on Sunday. When Fees arrived in Portland, he rented a car, and in the rental application he stated that he would return the car to the Spokane airport on Sunday.

At 11:00 a.m., on Saturday, a State Police officer saw Fees arrive at his residence and then watched Fees and his wife remove two boxes and the briefcase from the car and carry them into the house. Detective Morgan then telephoned the Informant who, in turn, telephoned Fees. Fees stated that the Informant's five pounds of marijuana had arrived and asked whether the Informant wanted an additional two pounds that they had previously discussed. The Informant answered that he would like the additional marijuana, and they arranged to meet that evening at Fees's restaurant.

At 11:15 a.m., the police observed Fees load a large box and his briefcase into the trunk of the rental car and drive away from his house. After Fees had driven out of sight from his house, the police stopped and arrested him. The police impounded the car pursuant to established procedure.

After Fees's arrest, the police observed a female jogger talking with a woman who had stopped her car near Fees's residence, and they saw a woman pushing an empty baby stroller talk with Fees's wife and enter his house. At about noon, fearing that Fees's wife may have learned of his arrest and may attempt to destroy evidence, the police entered Fees's house to secure it while waiting for a search warrant. They searched for and removed the occupants and prevented anyone from entering the house. Some of the officers observed evidence of a marijuana growing and distribution operation while in the house. They were in the house from four to six minutes, except for one officer who remained in the house for about ten minutes while waiting for Fees's wife to get dressed.

At 1:00 p.m., Detective Morgan sought a search warrant from a magistrate judge. He did not appear before the magistrate, but testified by telephone. At the conclusion of

the hearing, the magistrate approved a search of Fees's house, restaurant, and vehicles and the rental car, and he authorized the detective to sign the magistrate's name to the search warrant. The magistrate himself did not personally sign the search warrant. The officers then executed the search warrant.

On February 19, 2002, the State filed a criminal complaint charging Fees with trafficking in marijuana. On April 24, 2002, Fees waived his right to a preliminary hearing, and he was bound over in the district court to answer to the felony offense of trafficking in marijuana. On April 25, 2002, Fees filed a motion seeking to suppress all evidence obtained by the police during the traffic stop, the entry and later search of his house, and his post-arrest interrogation. On November 15 and 21, 2002, the district court heard the motion to suppress, and on January 22, 2003, it issued its memorandum opinion and order granting the motion in part. The district court held that the search warrant was invalid because the magistrate did not sign another original of the warrant after authorizing the detective to sign the magistrate's name to the original warrant in the detective's possession. As a result, the court ordered that all evidence obtained during the search of the residence must be suppressed. The district judge also ordered that any evidence obtained during the entry to secure the residence be suppressed because the warrant was invalid and the entry was made before the warrant was issued. The district court denied the remainder of the motion to suppress. The State then appealed.

## II. ISSUES ON APPEAL

A. Was the search warrant invalid because the magistrate did not personally sign an original copy of the warrant in addition to authorizing the law enforcement officer to sign the magistrate's name to an original copy?

B. Did the warrantless entry into Fees's house to secure it while waiting to obtain a search warrant require suppression of evidence obtained during such entry?

### III. ANALYSIS

 When we review an order granting or denying a motion to suppress, we accept the trial court's factual findings, unless they are clearly erroneous. *State v. McCall,* 135 Idaho 885, 26 P.3d 1222 (2001). We exercise free review, however, over the trial court's determination of whether or not those facts require suppression of the evidence. *Id.*

A. **Was the Search Warrant Invalid Because the Magistrate Did Not Personally Sign an Original Copy of the Warrant in Addition to Authorizing the Law Enforcement Officer to Sign the Magistrate's Name to an Original Copy?**

 The district court held that the warrant issued in this case was invalid because the magistrate allegedly violated Idaho Code § 19–4406 by failing to personally sign a second original warrant. That statute provides:

If the magistrate is thereupon satisfied of the existence of the grounds of the application, or that there is probable cause to believe their existence, he must issue a search warrant, signed by him with his name of office, to a peace officer in his county, *commanding him forthwith to* search the person or place named, for the property specified, and to bring it before the magistrate.

If the affidavit for the warrant is related to the court telephonically, the magistrate may verbally authorize a peace officer to sign the magistrate's name on a duplicate original warrant, which verbal authorization shall be recorded and transcribed. After service of the warrant, this duplicate original warrant must be returned to the magistrate who authorized the signing of his name on it. The magistrate shall then endorse his name and enter the date on the warrant when it is returned to him. Any failure of the magistrate to make such an endorsement does not in itself invalidate the warrant.

The district court read each paragraph of the statute as imposing an independent requirement. It read the first section of the statute as requiring the magistrate to "issue a search

warrant, signed by him," in all cases in which a search warrant issues. It read the second paragraph as requiring a duplicate original warrant, signed by a peace officer upon the verbal authorization of the magistrate, if the affidavit for the warrant was related to the court telephonically. According to the district court, if the magistrate did not personally sign the warrant mentioned in the first paragraph, then the duplicate original mentioned in the second paragraph was rendered void, even if it was properly issued. The reference to a "duplicate original" in the second paragraph certainly infers that there will be two original search warrants. Otherwise, there could not be a duplicate original. The statute does not address, however, what happens if there are not two original warrants in a case such as this where the magistrate authorized the issuance of a search warrant by telephone. Thus, the issue is whether the original search warrant, to which the officer signed the magistrate's name, was invalid if the magistrate did not execute a second original search warrant to keep in his possession.

Article I, § 17, of the Constitution of the State of Idaho provides: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized." In *State v. Badger*, 96 Idaho 168, 525 P.2d 363 (1974), we held that the word "affidavit" is broad enough to include the recording of sworn testimony. Now, we must decide whether the word "issue" is broad enough to include a search warrant to which an officer signs the magistrate's name pursuant to the magistrate's authorization.

In *State v. Mathews*, 129 Idaho 865, 934 P.2d 931 (1997), this Court held that an unsigned search warrant was invalid because it had not been issued as required by Art. I, § 17, of our Constitution. In this case, however, the search warrant was not unsigned. The magistrate authorized Detective Morgan to sign the magistrate's name to the warrant in Detective Morgan's possession, and he did so. He signed, "Benjamin R. Simpson by

Terry Morgan." That signature had the same validity as if the magistrate had personally signed his own name. The word "signature" is defined as, "A person's name or mark written by that person *or at the person's direction.*" BLACK'S LAW DICTIONARY, 1387 (7th ed.1999) (emphasis added). Once Detective Morgan had signed the magistrate's name on the warrant pursuant to the magistrate's authorization, that warrant became an original warrant that had been issued by a magistrate. In fact, the statutory reference to a "duplicate original" shows that the legislature understood that such a warrant would be an original warrant. A duplicate original is not a mere copy; it is an original with the same standing and validity as any other original. Since the search warrant in the hands of Detective Morgan was an original issued by the magistrate, it was valid and authorized the search of Fees's residence. The district court's conclusion that such search warrant was invalid is reversed.

**B. Did the Warrantless Entry into Fees's House to Secure It While Waiting to Obtain a Search Warrant Require Suppression of the Evidence Obtained During Such Entry?**

The police entered Fees's house an hour before the search warrant hearing in order to secure the premises to prevent the destruction of evidence. The district court held that such entry was unjustified for three reasons: the search warrant subsequently issued was invalid, the entry was made before the search warrant had been issued, and the entry was made to prevent destruction of evidence of a non-violent crime. We have already addressed the issue of the validity of the search warrant. We will now address the other two bases for the suppression order.

■ **1. Is an entry to secure premises in order to prevent the destruction of evidence per se unreasonable if it was made before the search warrant was issued?** In *State v. Gomez*, 101 Idaho 802, 623 P.2d 110 (1980), this Court addressed the validity of an entry into premises to secure them in order to prevent the destruction of evidence.

In *Gomez*, two officers had entered the premises ten to fifteen minutes prior to the arrival of the search warrant that had already been issued. When addressing that issue we noted that there was a split of authority among courts concerning the effect of entries made before the warrant was issued. We did not choose sides on that issue, however, because the entry in *Gomez* was made after the officers knew the search warrant had been issued and while they were waiting for it to arrive.

> There is currently a split of authority among the courts concerning the effect of entries intended to secure the premises where no warrant has been issued. Some courts actively condone the practice of securing the premises while the warrant is being obtained. Other courts hold that the initial entry, assuming its constitutional or statutory infirmity, does not taint the second entry and search undertaken pursuant to a valid search warrant. Still others find the initial entry undertaken prior to the issuance of the warrant to be so repugnant as to require suppression of evidence subsequently seized pursuant to a validly issued and executed warrant. However, we need not choose between these conflicting lines of authority. Today we hold only that an entry intended to secure the premises is not improper when undertaken after and with knowledge of the issuance of the warrant, but prior to its arrival at the premises to be searched.

101 Idaho at 810, 623 P.2d at 118 (citations omitted).

After *Gomez* was decided, the United States Supreme Court resolved the issue of the validity of an entry made to secure the premises before the search warrant was issued. In *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), nineteen hours before the issuance of the search warrant, police officers made a warrantless entry into the defendant's residence in order to secure it and prevent the destruction of evidence. The Supreme Court addressed two issues. The first was "whether the entry and internal securing of the premises constituted an impermissible seizure of all the contents of the apartment, seen and

unseen." 468 U.S. at 798, 104 S.Ct. at 3382, 82 L.Ed.2d at 604. The Court resolved that issue as follows:

> On this first question, we conclude that, assuming that there was a seizure of all the contents of the petitioners' apartment when agents secured the premises from within, that seizure did not violate the Fourth Amendment. Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* The second issue was "whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as 'fruit' of the illegal entry." *Id.* The Court resolved that issue as follows:

> On this issue, we hold that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

468 U.S. at 799, 104 S.Ct. at 3382, 82 L.Ed.2d at 604–05.

The Supreme Court addressed a similar issue in *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). In that case, two police officers accompanied a woman, at her request, to the trailer where she lived with her husband so that they could keep the peace while she removed her belongings. Once she had collected her possessions, she told one of the officers that her

husband, who was in the trailer, had "dope in there." The officer knocked on the door and asked the husband for permission to search the trailer, which the husband denied. The officer then sent the other officer to obtain a search warrant. At that point, the husband was on the porch, and the officer told him he could not re-enter the trailer unless the officer accompanied him. During the next two hours, the husband re-entered the trailer two or three times to obtain cigarettes and make phone calls, and each time the officer went into the trailer with him, standing just inside the door to observe what the husband did. When the other officer returned with the search warrant, the officers then searched the trailer and found a marijuana pipe, and small box for storing marijuana, and a small amount of marijuana. The trial court granted the husband's suppression motion, and the state appealed.

The Supreme Court held that the seizure of the husband to prevent him from re-entering his trailer where he could destroy the evidence was reasonable under the Fourth Amendment, under the following combination of circumstances. "First, the police had probable cause to believe that McArthur's trailer home contained evidence of a crime and contraband, namely, unlawful drugs." 531 U.S. at 331–32, 121 S.Ct. at 950, 148 L.Ed.2d at 848. "Second, the police had good reason to fear that, unless restrained, McArthur would destroy the drugs before they could return with a warrant." 531 U.S. at 332, 121 S.Ct. at 950, 148 L.Ed.2d at 848. "Third, the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. They neither searched the trailer nor arrested McArthur before obtaining the warrant." Id. "Fourth, the police imposed the restraint for a limited period of time, namely, two hours. As far as the record reveals, this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." Id. (citation omitted). Thus, the district court erred in holding that the officers' warrantless entry into Fees's residence to prevent the destruction of evidence was unreasonable because the search warrant had not yet been issued.

■ **2. May a warrantless entry into a residence to prevent the destruction of evidence only be made if the evidence relates to a crime of violence?** Relying upon State v. Curl, 125 Idaho 224, 869 P.2d 224 (1993), the district court held that the warrantless entry into Fees's residence to preserve evidence was unreasonable because it was to preserve evidence of a nonviolent crime. In State v. Curl, an officer saw a puff of white smoke that smelled like freshly burning marijuana come from an apartment that Curl had just exited. When Curl saw the officer, he ran back into the apartment. The officer pushed open the door and followed him into the apartment, where he found marijuana and drug paraphernalia. The officer then cited Curl and the other occupant of the apartment with the misdemeanor offenses of possession of marijuana and possession of drug paraphernalia. After the magistrate judge granted the defendants' motion to suppress, the State appealed. This Court identified the issue as "whether [the officer's] warrantless entry into a private residence violated the Fourth Amendment to the United States Constitution." 125 Idaho at 225, 869 P.2d at 225. This Court then analyzed the opinion of the United States Supreme Court in Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), in which the Supreme Court held that police entry into the home of someone suspected of drunken driving in order to preserve evidence of his blood-alcohol level was unreasonable under the Fourth Amendment. In doing so, the Supreme Court stated, "When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness [from a warrantless home entry] is difficult to rebut." 466 U.S. at 750, 104 S.Ct. at 2098, 80 L.Ed.2d at 743. This Court in Curl concluded, "The unescapable [sic] conclusion that we must draw from Welsh is that if an offense falls within the category of 'relatively minor' offenses, the fact that the defendant will almost certainly destroy the relevant evidence is simply not enough of an exigency to justify a warrantless entry into a home." 125 Idaho at 226, 869 P.2d at 226 (citation omitted).

This Court in Curl then addressed what constitutes a "relatively minor" offense under

the Fourth Amendment. After noting that *Welsh* stopped short of declaring where the line should be drawn, the *Curl* Court drew the line between violent and nonviolent offenses. The United States Supreme Court's later opinion in *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), indicates that the *Curl* Court did not accurately predict the criteria upon which the Supreme Court would ultimately draw the line, however. Rather than drawing the line based upon the nature of the criminal conduct (i.e., violent versus nonviolent), the Supreme Court has drawn it based upon the nature of the penalty for that criminal conduct.

■ McArthur relied upon *Welsh* to support his argument that the police conduct in his case was unreasonable under the Fourth Amendment because they only had probable cause to believe he had committed two misdemeanors (possession of marijuana and of drug paraphernalia), both of which happened to be nonviolent crimes. In rejecting that argument, the Supreme Court first noted, "In *Welsh*, this Court held that police could not enter a home without a warrant in order to prevent the loss of evidence (namely, the defendant's blood alcohol level) of the 'nonjailable traffic offense' of driving while intoxicated." 531 U.S. at 335, 121 S.Ct. at 952, 148 L.Ed.2d at 850 (citation omitted). The Court stated that there were "significant distinctions" between McArthur's case and those in *Welsh*. "The evidence at issue here was of crimes that were 'jailable,' not 'nonjailable.' " *Id.* at 336, 121 S.Ct. at 952, 148 L.Ed.2d at 850. McArthur could receive up to thirty days in jail for possession of marijuana and up to one year in jail for possession of drug paraphernalia. In drawing that distinction, the Court stated, "In *Welsh*, we noted that, '[g]iven that the classification of state crimes differs widely among the States, the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." *Id.* The second significant distinction was that the restriction at issue in McArthur's case was less intrusive than the intrusion in *Welsh*. "Temporarily keeping a person from entering his home, a

consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." *Id.* Thus, when *McArthur* and *Welsh* are read together, the determination of what constitutes a "relatively minor" offense under the Fourth Amendment is not based upon the nature of the criminal conduct (i.e., whether the offense is violent or nonviolent); rather, it is based upon the nature of the penalty that may attach for such conduct.

In this case, the police entered Fees's residence to prevent the destruction of evidence of the felony offense of trafficking in marijuana where the quantity of marijuana involved was more than five pounds but less than twenty-five pounds. The penalty for that offense is a minimum of three years and up to fifteen years of incarceration in the state penitentiary. IDAHO CODE § 37-2732B(a)(1)(B) & (D) (2002). Considering that penalty, trafficking in marijuana is not a relatively minor offense. Therefore, the district court erred in holding that the entry was per se unreasonable under the Fourth Amendment because the police were seeking to preserve evidence of a nonviolent offense.

■ Fees also claimed that the intrusion into his residence was unreasonable under Article I, § 17, of the Constitution of the State of Idaho. The guarantee against unreasonable search and seizure under that provision is substantially the same as the Fourth Amendment. *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983). Although the wording of the two constitutional provisions is similar, this Court has at times construed the provisions of our Constitution to grant greater protection than that afforded under the United States Supreme Court's interpretation of the federal Constitution. For example, in *State v. Webb*, 130 Idaho 462, 943 P.2d 52 (1997), we concluded the United States Supreme Court's definition of curtilage for Fourth Amendment analysis did not adequately reflect the privacy interests of Idaho citizens under Article I, § 17, of the Idaho Constitution. In *State v. Henderson*, 114 Idaho 293, 756 P.2d 1057 (1988), we held that

roadblocks established to apprehend drunk drivers violate Article I, § 17, of the Idaho Constitution, while in *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court held that such roadblocks do not violate the Fourth Amendment. In *State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988), we held that the installation of a pen register device by the government constitutes a search under our Constitution, even though in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Supreme Court had held that it did not constitute a search under the federal Constitution. In these cases, we provided greater protection to Idaho citizens based on the uniqueness of our state, our Constitution, and our long-standing jurisprudence. *State v. Donato,* 135 Idaho 469, 20 P.3d 5 (2001). None of these factors support a divergence from the interpretation of the Fourth Amendment by the United States Supreme Court in this case.

Because it concluded that the search warrant was invalid because the magistrate did not personally sign it, the district court did not address other issues raised by Fees. Although we find that the district court erred when holding the warrant invalid, we do not address those issues argued to, but not decided by, the district court. We will therefore vacate the order suppressing evidence and remand this case for further proceedings consistent with this opinion.

## IV. CONCLUSION

The order suppressing evidence is vacated and this case is remanded for further proceedings consistent with this opinion.

Chief Justice TROUT and Justices SCHROEDER, KIDWELL and BURDICK concur.